UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN KING, | : | |
| | : | |
| Plaintiff, | : | NO. 3:05CV949 (MRK) |
| | : | |
| v. | : | |
| | : | |
| GORDON R. ENGLAND, | : | |
| SECRETARY OF THE NAVY, | : | |
| | : | |
| Defendant. | : | |

## Memorandum of Decision

In this employment discrimination action, Plaintiff Susan King claims that Defendant Gordon England, sued in his capacity as Secretary of the Navy, discriminated against Ms. King in violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) by failing to offer her reasonable accommodation after she allegedly became disabled in February 2003.[1] Secretary England has moved for summary judgment on Ms. King's Complaint [doc. # 1]. For the reasons explained below, the Court GRANTS Defendant's Motion for Summary Judgment [doc. # 26].

**I.**

The following forms the factual background to Ms. King's Complaint. As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Ms. King.[2]

---

[1] Ms. King has also filed a related action against the United States under the Federal Tort Claims Act for allegedly causing the condition from which Ms. King's present claims arise. *See* King v. United States, No. 04cv2098 (MRK). In a separate opinion, the Court will address a motion for summary judgment in that action.

[2] The facts are taken from the statements in Defendants' Local Rule 56(a)1 Statement [doc. # 35], none of which Ms. King has contested, as well as the uncontested statements from the United States' Local Rule 56(a)1 Statement [doc. # 26-15] in King v. United States, No. 04cv2098 (MRK), which Secretary England incorporated by reference in his statement.

Ms. King worked as a social worker in the Fleet and Family Support Center ("Family Support Center") of the Naval Submarine Base New London, in Groton, Connecticut (the "Groton Base"), from November 18, 2002, through February 21, 2003. She was employed pursuant to a contract between the Navy and her employer, Information Network Services. The Family Support Center was located at all relevant times in Building 83 of the Groton Base.

In October 2002, the Navy posted a vacancy for the position of social worker at the Groton Base. This position would be very similar in function to the position Ms. King then held. In January 2003, Ms. King applied for that position and was selected to fill it. Ms. King was directed to report to the Human Resources Office at the Groton Naval Submarine Base on February 24, 2003 for processing for her new position. On January 29, Ms. King sent a letter to Information Network Services, informing her employer that she would be resigning effective February 21, 2003.

However, beginning in January 2003, before Ms. King could begin her employment with the Navy, Building 83, where Ms. King then worked for Information Network Services, underwent renovations. In early February 2003, Ms. King was exposed to chemicals and toxins emitted during this renovation, which caused her to suffer burning eyes, mouth, and throat, as well as asthma and respiratory allergic symptoms. The renovation work was performed by a private construction company under contract with the Navy.

During the course of the contractors' work at Building 83 on February 3 or 4, the contractors set up temporary lighting in the building's basement. On the afternoon of February 6, employees at the Family Support Center noticed a burning smell in the office. These employees, including Ms. King, reported the offensive smell to their immediate supervisor, Lynn-Marie Smith-Martin. Two clinicians in addition to Ms. King reported a burning feeling in their noses and scratchy throats.

2

After receiving these reports of odor and discomfort, Ms. Smith-Martin reported the complaints to her supervisor, Paul East, who was the Director of the Family Support Center. At Mr. East's request, a representative from either the Base Safety Office or Industrial Hygiene Office came to the Family Support Center offices on February 6.

The Groton Base was closed the next day due to snow, and when the employees returned to work on the following Monday, February 10, Ms. King and other members of the Family Support Center administrative staff reported to Ms. Smith-Martin that the odor remained in their offices. Ms. Smith-Martin again informed Paul East of these reports.

Later on the morning of February 10, Barbara Ross, Program Manager for the Family Support Center, investigated the odors. Ms. Ross reported to Ms. Smith-Martin that she would check Ms. King's office and that she would contact the Safety Office and inform Mr. East of the situation. Soon thereafter, Natali Krause from the Industrial Hygiene Department came to Building 83 to investigate the odor. Ms. Krause, an Industrial Hygienist, noticed that a burning smell was still present. She spoke with the employees about the reactions they were having and how long the smell had persisted. She also advised the employees to open the windows for fresh air and to go to the base Occupational Health Office if they continued to experience symptoms.

Ms. Krause followed the odor down a flight of stairs and into a basement hallway, where she saw that the plastic protective cages surrounding light bulbs, which had been brought in by the contractors for the renovation project, had melted. Ms. Krause concluded that this situation was the likely source of the offensive odor. The cages were then changed and the other employees who experienced discomfort reported that their symptoms cleared later that morning. Ms. Krause

3

confirmed with the contractor personnel that no chemicals had yet been used during the course of the renovation in that area of Building 83.

Ms. King was told not to go into her office the following morning, February 11, because Mr. East and Ms. Krause intended to enter it together to investigate the odor. Ms. King spent that morning working in another clinician's office on the same floor and continued to smell the odor at one end of the office corridor. Ms. Krause and Mr. East did not detect any offensive odor in Ms. King's office. However, because the employees had reported that the odor had been strongest in Ms. King's office, Mr. East arranged to temporarily relocate her downstairs to the main floor of Building 83. On February 12, Ms. King called in sick and did not report to work. On the following day, Ms. Smith-Martin arranged for Ms. King's belongings to be moved down to the main floor of the support center. While Ms. King worked for most of February 13 on the main floor, she still smelled and reacted to the odor in the upstairs hallway.

On Friday, February 14, Ms. King called in sick, and on Monday, February 17, the center was closed because of a national holiday. From February 18 through 20, 2003, Ms. King was out of the office on approved leave. Mr. East continued to check Ms. King's original office space each day to assess whether any odor had returned. Mr. East does not recall any complaints about odors or general air quality in that period of time.

On February 21, 2003, Ms. King returned to work. When she reported to the alternate office provided for her on the main floor of the building that morning, she suffered another serious reaction and again left work.[3] Her reaction was so severe that she went to the Westerly Urgent Care Facility,

---

[3] Several other employees at the Family Support Center smelled a diesel-like odor on the morning of February 21, 2003, in the area by the window of the administrative office space. An investigator was dispatched either from the Safety Office or the Industrial Hygiene Department. The

4

as she had done several times since her first exposure early that February. A doctor at the facility provided her with a note indicating that she be excused from work from February 21, 2003 to February 26, 2003. Ms. King did not report to Building 83 again after February 21, 2003.

On Monday, February 24, 2003, Ms. King reported to the Groton Base human resources office to process paperwork to become a federal employee. During the course of processing her paperwork, Ms. King produced a note from one of her doctors, which stated that she could not work in Building 83. Rather, Ms. King asked that she be transferred to another building on the Groton Base, to which a group of nurses had already been transferred from Building 83, or to the Naval Base in Newport, Rhode Island or New Haven, Connecticut. Ms. King's processing lasted for two hours when Kenneth Potter, the Supervisory Human Resources Management Specialist, determined that the processing could not be completed without further medical information from Ms. King. As a result, she was sent home.

On February 26, Ms. King was seen by Dr. Mark Andreozzi, who prepared a report dated March 4. Dr. Andreozzi's report states that Ms. King began to experience changes in her vision soon after renovation began on Building 83, as well as burning in her mouth, throat, and eyes two weeks thereafter. Dr. Andreozzi diagnosed Ms. King with "[i]rritant-induced allergic rhinoconjunctivitis as well as pharyngitis with associated asthma symptoms," which he believed "within a reasonable degree of medical certainty" were related to "exposure to irritants in her work place." Local Rule 56(a)1 Statement [doc. # 35] Ex. B at 2. Dr. Andreozzi also noted that Ms. King smoked half a pack of cigarettes per day and that her symptoms improved after time away from Building 83, but

---

investigator concluded that the diesel fumes were most likely the result of delivery vehicles idling near the Family Support Center offices, and the fumes did not continue beyond a brief period on that morning.

exacerbated soon after she reentered the building. He concluded his report with a recommendation that Ms. King never again enter Building 83, and he further indicated that she should remain out of work for two weeks.

On March 11, Ms. King sent a letter to Mr. Potter, informing him that her doctor had directed her to remain out of work until March 17. The letter further informed him that she would not be returning to Building 83, that she wanted to know what accommodations would be made for her and what forms she should fill out to be paid for the two hours she spent processing her paperwork. Mr. Potter contacted Ms. King on March 13 to inform her that he was still considering her accommodation request, and he directed her not to report to work on March 17. Ms. King reiterated by letter that she had been told by Dr. Andreozzi not to reenter Building 83 and that her accommodation should be a workspace that was not Building 83. She further stated her impression that her time out of work would be considered medical leave, and stated that she expected to be paid for the two hours she spent processing paperwork on February 28 and for every day after March 17, "whether [she] report[ed] to work at the base or . . . at home." " Local Rule 56(a)1 Statement [doc. # 35] Ex. L.

On March 28, James Kautz, the Human Resources Director at the Groton Base responded to Ms. King's March 13 letter. Mr. Kautz informed Ms. King that she had provided insufficient information from which the Navy could make a decision on the matter, because Dr. Andreozzi's report did not specify the irritants or allergens to which she was susceptible, did not describe either what functional limitations she had with respect to the position she would be assuming or what specific requirements of the position needed to be accommodated. Mr. Kautz asked Ms. King to submit further documentation, but advised her that it was the Navy's position that, because she had

6

not completed the processing for her job and had not been sworn in, she was not yet a federal employee. Mr. Kautz informed Ms. King that, should she not provide sufficient medical documentation before April 11, 2003, her offer of employment would be rescinded.

Dale King, Ms. King's husband and an attorney, responded on April 8 to Mr. Kautz's letter. In his response, Mr. King disputed Mr. Kautz's assertion that Ms. King was not a federal employee, and he gave reasons why his wife should be accommodated outside of Building 83. Mr. King further asserted that the medical information his wife had already supplied was sufficiently detailed and clear, and that it did not include specific allergens or irritants because the Navy refused to supply information about what chemicals were in use in Building 83 before and at the time of Ms. King's reactions.

Mr. Kautz responded by letter on April 29 to Mr. King's letter. Mr. Kautz reiterated that, because Ms. King was unable to begin work at the appointed time and place, her paperwork was not able to be completed, and she was therefore not a federal employee. As to the issue of accommodation, Mr. Kautz stated that Ms. King's medical documentation, while indicating a present impairment, did "not support the finding of a disability for which accommodation is required," and that Ms. King had not "established the existence of such a handicapping condition." *Id.* Ex. N.

Mr. Kautz stated that, even though Ms. King had provided insufficient evidence of a disability requiring accommodation, the Navy had nevertheless evaluated her request to be placed in another building. Before making his decision, Mr. Kautz approached Mr. East to determine whether locating Ms. King in another building on the Groton Base would be feasible. Mr. East responded with several reasons, grounded in safety, convenience, and client confidentiality, for why that alternative would not be feasible. Mr. East stated that to locate a social worker outside of

Building 83 would "turn[] the operation upside down for the Supervisor, and Social Worker." *Id.* Ex. P at 4. Mr. Kautz also discussed the potential accommodation with Mr. Potter. Ultimately, Mr. Kautz determined that Ms. King could not be moved to another building because "the essential functions of a social worker in the Fleet and Family Support Center cannot be performed in a remote location of another building without creating undue hardships on the Fleet and Family Support Center and unacceptably degrading their ability to perform their mission." *Id.* Ex. N. Therefore, because Ms. King refused to work in Building 83 and because the Navy determined it could not employ her as a social worker in a building other than Building 83, the Navy withdrew Ms. King's offer of employment. In August 2003, Ms. King gained employment as a psychiatric social worker at William Backus Hospital in Norwich, Connecticut. She has also set up a small private practice.

On January 29, 2004, Ms. King was evaluated by Dr. Carrie Redlich, who concluded that Ms. King was still "suffering from persistent upper respiratory allergic rhinitis type symptoms following building renovation at work." Local Rule 56(a)1 Statement [doc. # 35] Ex. C. at 3. Dr. Redlich noted that Ms. King continued to experience reactions to "insecticides, pesticides, spray starch [and] furniture polish." *Id.* at 2. While Dr. Redlich speculated that Ms. King may have developed asthma, she noted that there was no documentation to support that finding. She also noted that Ms. King's lungs were "clear to auscultation," which meant that, upon examination, her lungs sounded normal. Dr. Redlich reported that Ms. King continued to smoke half a pack of cigarettes per day. Finally, Dr. Redlich advised Ms. King that she may have continued sensitivity to chemicals, but "reassured her that [Dr. Redlich] did not expect any long term permanent injury and . . . that [her] experience was that with time symptoms usually improve." *Id.* at 3.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration in the original)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment "may not rest upon . . . mere allegations or denials . . . ." Fed. R. Civ. P. 56(e). Rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

**III.**

Ms. King alleges that she was discriminated against on the basis of the respiratory problems she developed while working in Building 83, and that this discrimination violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. To establish a prima facie violation of Section 504, Ms. King must demonstrate, among other things, that "(1) [she] is a person with a disability under the meaning of the [Americans with Disabilities Act ("ADA")]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). Secretary England asserts that Ms. King does not suffer from a disability and that the accommodation she demanded–a workspace other than Building 83–was unreasonable. As explained below, the Court concludes that Ms. King's respiratory condition does not qualify her as disabled within the meaning of the Rehabilitation Act, and therefore, the Court has no occasion to evaluate the reasonableness of the Navy's conduct regarding her requested accommodation. Because Ms. King has failed to establish a prima facie case of disability discrimination, Secretary England is entitled to summary judgment on her Section 504 claim.

The parties agree that, in order to qualify as an individual with a disability within the meaning of Section 504, Ms. King must show that her condition amounts to a substantial limitation on a major life activity. *See, e.g.*, *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002). Ms. King claims that her "[i]rritant-induced allergic rhinoconjunctivitis as well as pharyngitis with associated

asthma symptoms" substantially impairs her in the major life activity of breathing.[4] The Court disagrees.

In the context of the Rehabilitation Act and the ADA, which have virtually identical "reach and requirements," *Weixel*, 287 F.3d at 146 n.6, the case law indicates that suffering from asthma does not generally constitute a substantial limitation on the major life activity of breathing. *See Mutts v. S. Conn. State Univ.*, No. 3:04 CV 1746(MRK), 2006 WL 1806179, at *4-*6 (D. Conn. June 28, 2006) (collecting cases). Rather, asthma has been held to give rise to a substantial limitation on the major life activity of breathing only where the plaintiff has a long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition. *See, e.g.*, *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1245 (10th Cir. 2004) ("Since early childhood, [Plaintiff's] asthma has limited her activities. She has been instructed by her doctors to avoid crowds, cigarette smoke, people wearing perfume, and outdoor activities. She must avoid being active at night, remain indoors during windy conditions, and cannot be in enclosed spaces with cleaning agents. . . . [E]ven with . . . medications she experiences symptoms most of the time."); *Geuss v. Pfizer, Inc.*, 971 F. Supp. 164, 169 (E.D. Pa. 1996) (Plaintiff had "taken medication for his asthma on a daily basis for as long as he can remember," "had 1-2 asthma attacks a day," which were triggered by "[e]ven minor instances of physical exertion," and "force[d] him to avoid certain pets, cigarette smoke, perfume, and fresh paint."). This is particularly the case when the asthma is controlled by certain medications. *See Kropp ex rel. S.K. v. Me. Sch. Admin. Union*

---

[4]While in her briefing, Ms. King claims that her respiratory condition also impacts the major life activity of working, she did not include this claim in her current or her administrative complaint, and it is thus deemed not to be a part of this case. The Court adds that, in light of Ms. King's gainful employment in the same field and in a similar position to what she held while working at the Groton Base, it is unlikely that Ms. King could succeed on such a claim in any event.

*# 44*, Civil No. 06-81-P-S, 2007 WL 551516, at *17 (D. Me. Feb. 16, 2007) ("For a typical asthmatic treated with corticosteroids, inhalers and nebulizers, it can be very difficult to demonstrate a substantial[] limitation in the ability to breath[e] . Although such a person might well be substantially limited without his or her medication, it must be demonstrated that the limitation remains substantial even when medications and treatments are in place.") (citing *Sutton v. United Air Lines*, 527 U.S. 471, 481-83 (1999)); *White v. Honda of Am. Mfg.*, 241 F. Supp. 2d 852, 856 (S.D. Ohio 2003) ("Numerous courts have found that individuals who are able to treat their asthma such that they are able to engage normally in physical exertion without symptoms are not substantially limited in any major life activity.") (collecting cases); *Smith v. Tangipahoa Parish Sch. Bd.*, Civ. Action No. 05-6648, 2006 WL 3395938, *8 & n.9 (E.D. La. Nov. 22, 2006) (finding that plaintiff had not established that she suffered from a substantial limitation in breathing where she had to take daily medications and to have an EpiPen on hand at all times, because she "could potentially have a very severe reaction under some circumstances," but had not yet had such a serious reaction) (collecting cases).

Where, by contrast, a plaintiff suffers asthma attacks only in response to particular stimuli and is able to engage in almost all normal life activities, courts have been disinclined to conclude that the plaintiff is substantially limited in the major life activity of breathing. *See, e.g.*, *Muller v. Costello*, 187 F.3d 298, 314 (2d Cir. 1999) (Plaintiff's "substantial physical activity without encountering debilitating allergens cuts against his claim of disability. Simply put, there is not enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity."); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (concluding that, despite respiratory problems at work, plaintiff's "ability to breathe restricted her only in a limited way, and

12

did not bar her from exercising"); *Mutts*, 2006 WL 1806179, at *6 ("In this case, Mrs. Mutts has not presented any evidence that she developed her asthmatic condition as a child, rather than as an adult, or that she has been told by doctors to avoid stimuli other than exposure to multiple chemicals in enclosed spaces, or that her asthma is triggered by ordinary activity as opposed to prolonged or intense physical exertion."); *Droutman v. N.Y. Blood Center, Inc.*, No. 03-CV-5384(DRH/ARL), 2005 WL 1796120, at *6 (E.D.N.Y. July 27, 2005) (Plaintiff's "ten or so asthma attacks were apparently limited to her working environment, self-medicated with an inhaler, and mitigated by breathing exercises and movement to an area of fresh air[.] [Plaintiff] was also generally capable of performing her job assignments [and] thus did not have a 'disability' as defined by the ADA . . . .").

In this case, Ms. King has not presented any evidence that she developed her asthmatic condition as a child–in fact, she is suing the United States in a related case because she believes she developed this condition while working at the Groton Base in 2003. Nor has she shown that she has been told by doctors to avoid stimuli other than exposure to Building 83, or that her asthma is triggered by ordinary activity as opposed to exposure to particular chemicals. Furthermore, as noted by both Dr. Andreozzi and Dr. Redlich, Ms. King smoked half a pack of cigarettes per day immediately after her alleged exposure to toxins in Building 83 and continued to do so a year later. Therefore, she is apparently able to handle direct exposure to some chemicals and irritants. *See Mutts*, 2006 WL 1806179, at *6 ("Furthermore, as she testified at deposition, she is able to smoke without aggravating her [asthmatic] condition.").

Even Ms. King's own statements reveal that the scope of her limitation is narrow. Ms. King states that all of her doctors advised her to stay out of Building 83, *see* Local Rule 56(a)1 Statement [doc. # 35] Ex. D at 3, not that she must avoid a broad range of toxins or environments, or indeed

other buildings on the Groton Base. Ms. King also states that she is limited in that she can no longer clean her house because she reacts to the cleaning agents, she can no longer do arts and crafts because she has adverse reactions to glue, and she must alter her shopping activities because of reactions to fumes from vehicles, pesticides, insecticides, and chemicals. She also says that she must daily take at least two medications to control her symptoms. However, Ms. King has not–conspicuously it seems to the Court–mentioned any adverse reactions she has to working in a hospital, a location where surely a large number of cleaning agents are employed, among other chemicals; nor has she mentioned any accommodations she requires to work at the hospital. Moreover, even Dr. Redlich stated in her evaluation a year after Ms. King's alleged exposure to toxins in Building 83 that she did not expect any long term permanent injury and that Ms. King's condition would continue to improve over time. *See Adams v. Citizens Advice Bureau*, 187 F.3d 315, 316-17 (2d Cir. 1999) (per curiam) (finding that a temporary impairment of three-and-a-half months did not rise to the level of a disability under the ADA); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (finding a temporary impairment of seven months "too short [in] duration . . . to be 'substantially limiting'").

Thus, Ms. King's respiratory condition is quite distinguishable from those cases in which courts have found the plaintiff's respiratory condition to be persistent, permanent, and substantially limiting. On the basis of the account of the history and nature of her respiratory condition presented in Ms. King's own submissions, the Court concludes that no reasonable jury could find that the "[i]rritant-induced allergic rhinoconjunctivitis as well as pharyngitis with associated asthma symptoms" that Ms. King developed in 2003 substantially limits her in the major life activity of breathing. *See, e.g.*, *Heilweil*, 32 F.3d at 724 (affirming summary judgment); *Mutts*, 2006 WL

1806179, at *6 ("On the basis of the account of the history and nature of her asthmatic condition presented in Mrs. Mutts' own submissions, the Court concludes that no reasonable jury could find that Mrs. Mutts' asthma substantially limits her in the major life activity of breathing."); *Droutman*, 2005 WL 1796120, at *6 (granting summary judgment). Therefore, Ms. King has failed to make out a prima facie case of disability discrimination, and Secretary England is accordingly entitled to summary judgment on Ms. King's Complaint.

## IV.

The Court GRANTS Defendant's Motion for Summary Judgment [doc. # 26]. **The Clerk is instructed to enter judgment for the Defendant and to close this file.**

IT IS SO ORDERED.

/s/     Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: June 22, 2007**.